# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DONALD FRANCIS KING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 12-CV-137-JED-TLW |
| v. ) | |
| ) | |
| STANLEY GLANZ, in his Official ) | |
| Capacity as Sheriff of Tulsa County; and ) | |
| LAMONT HILL, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Plaintiff, Donald Francis King, sustained severe injuries resulting from a gunshot fired by Tulsa County Sheriff's Deputy Lamont Hill. At the time of the shooting, Mr. King was unarmed. King alleges that the shooting was excessive force in violation of the United States and Oklahoma Constitutions. Hill seeks summary judgment (Doc. 77) on all claims against him.

## I. Background

The following facts, which the Court must view in the light most favorable to King, are found in the summary judgment record. On December 1, 2010, King's step daughter, Kasey Apple, called 911. Apple reported to the 911 dispatcher that her mother, Sherral Dalton, had reported to Apple by phone that King (Dalton's husband) was making threats and had broken a water line at the home where Dalton and King lived on Iroquois Avenue. Apple reported that King is bipolar and was "off his meds." In response to the dispatcher's questions, Apple reported multiple times that there were no known weapons in the Iroquois Avenue house.

Immediately after Apple's call to 911, at 3:31 p.m., a "domestic disturbance" dispatch call went out to the Tulsa County Sheriff's Office (TCSO) to respond to the Iroquois Avenue

home. The dispatch call stated that King had broken a water line at the house, was threatening to harm a horse, "there are no known weapons" at the location, and that King was "10-85." Upon hearing the dispatch call, Deputy Lamont Hill instructed his trainee, Allen Goodson, to respond on the radio that they would take the call, with Deputy Brian Walker also responding. The three TCSO deputies proceeded to the Iroquois Avenue location, with Hill and Goodson in one vehicle and Walker in another. All three of the deputies understood that the dispatcher's radio report of "10-85" meant that King was mentally ill. Upon arrival near the Iroquois Avenue house, Hill encountered Sherral Dalton (King's wife), who was standing in the driveway to the home of a neighbor, Richard Harmon, Jr. Hill spoke to Dalton for about 15 or 20 seconds, and Dalton informed Hill that King had not hit or otherwise physically injured her. The deputies then drove toward the house where King was located.

Deputy Walker parked in front of the property, blocking the long driveway leading to the house. Walker and Goodson positioned themselves closer to talk to King, approximately 25 to 30 yards from King, while Hill stayed back at a distance of 65 to 75 yards. The testimony conflicts as to where, specifically, King was located when the deputies drove up to the property. Hill testified that King "ran" and "bolted for the house," while Deputy Walker and another witness testified that King was walking toward the house from his yard.

The record contains varying versions of what happened next. At some point, King was standing in the doorway of the home or just outside on the step leading out from the home, and it appeared to some witnesses that he was holding something. King was wearing a camouflage jacket, and was holding or carrying another camouflage jacket. The deputies assert that the second jacket was draped over both of King's arms and that the deputies believed that King could have had a "long gun" under that jacket. Neighbor Harmon testified that he could see both

2

of King's hands and King did not have anything in his hands. Another neighbor, Chester Jones Jr., testified that it was clear that King did not have anything in his hands, although he did have a coat, which was folded and draped over King's left arm. Jones testified that it was *not* possible that King had a long gun under that coat:

> Q. Mr. Jones, could [King] have possibly had a long gun under that coat?
>
> A. No. No. I own four long guns, and I couldn't - - no. It'd've been sticking way out like this (indicating) or - - couldn't - - couldn't hold a long gun, not. . . You can't hold a long gun like this (indicating).

Deputy Hill went to the trunk of his vehicle and retrieved his AR-15 rifle, inserted a magazine in the rifle, and trained his rifle on King. According to Jones, after Hill got his rifle out of his car and inserted a clip, Hill told Jones "Go back in the house, dog" and then "I thought I told you, go back in the house, dog. You don't want to see this."[1]

According to some witnesses (including Deputy Walker), Walker asked King to come out to talk. Walker testified that he told King to "put down whatever he had in his hands and that we just needed to talk." In response, King shouted at the deputies to "get back," "get off my property," or "get the fuck off the property." Some witnesses stated that King said that he had black powder, while others provided statements that King indicated that he had black powder "in the house." Hill asserts that King threatened to "blow you-all's asses up," while Walker testified that King said "I've got enough explosives to blow this place up. I'll - - you don't know if I'll do it. Get off my property."

According to Deputy Hill's deposition testimony, immediately before he fired his rifle, King "raised his hands up closer to his face from his middle of the chest area up here and said,

---

[1] After neighbor Jones went inside the house (in response to Deputy Hill's directives), he told his wife "Man, they're going to kill Don [King]. Don ain't got no gun. He – he – he going to get killed out there messing around."

3

'that's it, mother fuckers,'" and Hill then fired multiple rounds from his AR-15 rifle. In contrast, at a TCSO Critical Incident Review Board hearing, Hill stated that, immediately before he shot him, King yelled "Get on the fucking ground right now. I'm going to kill you right now." Hill did not report that King threatened to shoot the deputies:

Q. So was he also threatening to shoot you?

A. That I don't know.

Deputy Walker testified that, immediately before the shooting, King took a step toward him and Walker continued to yell at him to put down whatever he had in his hands. Neighbor Harmon testified that King was not making any threatening motions toward the deputies, but was just standing there in the doorway of the house. Harmon testified that one deputy yelled at King to show his hands, and King responded by starting to raise his hands, which he did in a manner that was not threatening. Some witnesses testified that King was off the porch, in the yard, when he was shot, while others testified that King was on the steps immediately adjacent to the front door when he was shot and then he fell off the steps after he was hit with the gunfire.

After firing the first shot, Hill did not think King was hit, because King "started to hunker down" to make himself smaller and more difficult to hit.[2] Hill rapidly fired two or three more shots at King. One of the shots hit King in the side, seriously injuring King and causing extensive internal injuries.

In his deposition, Hill testified that he shot King because he was in fear for himself and the other deputies, but his statement to the Review Board again differed. There, Hill reported that he did not believe King was aware of what Hill was doing, and said, "I really don't think [King] saw me, to tell you the truth." King's statement to the Review Board indicated that he

---

[2] In a prior statement to the Review Board, Hill testified that, after the first shot, King still had his hands up rather than starting to "hunker down" to make himself smaller.

4

was *not* afraid for himself, but he didn't want anything to happen to the other deputies. Neither of the two deputies standing much closer to King fired their weapons at King, but those deputies testified that they had their weapons ready to fire. A witness, Lemuel Ray Sayre, testified that, after he heard the shots, he heard a deputy ask "What'd you do that for? What'd you do that for?" According to Sayre, the deputy asking that question was the deputy who had just been trying to talk to King. Immediately after the shooting, deputies hand-cuffed King, then dragged or moved King across the yard to be transported to a hospital by ambulance. King was unarmed at the time of the shooting, and no weapons were found in his possession.

In his summary judgment motion, Hill argues that he is entitled to qualified immunity on King's claim under 42 U.S.C. § 1983, because Hill's use of deadly force was reasonable and not in violation of any clearly established law. With respect to King's claim under the Oklahoma Constitution, Hill argues that a person who is not incarcerated has no private right of action to bring a state constitutional claim for excessive force.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "By its terms, [the Rule 56] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The

courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255.

The Supreme Court recently reiterated that it is reversible error for a court to weigh the evidence or resolve any disputed issues in favor of the moving party. *See Tolan v. Cotton*, 572 U.S. ___, 134 S. Ct. 1861, 1866-68 (2014) (per curiam). A district court may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant. *Id.* Thus, reaching factual inferences that conflict with the non-movant's evidence is contrary to the "fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Id.* at 1868. The reason for this long-standing principle is that "witnesses on both sides come to [the] case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." *Id.*

### III. Analysis

#### A. Qualified Immunity

The general summary judgment standards apply to motions for summary judgment based on qualified immunity, and courts accordingly must draw the evidence and reasonable inferences in favor of the non-moving party. *Tolan*, 134 S. Ct. at 1866-68; *Scott v. Harris*, 550 U.S. 372, 377 (2007). In resolving questions of § 1983 qualified immunity at the summary judgment stage, courts engage in a two-pronged inquiry. *Tolan*, 134 S. Ct. at 1865. The first prong "asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201

(2001)); *see also York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008). "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan*, 134 S. Ct. at 1865 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). The second prong asks "whether the federal right was clearly established at the time of the violation." *Id.* at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Government officials are shielded from liability if their actions did not violate clearly established federal rights "of which a reasonable person would have known." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "'[T]he salient question ... is whether the state of the law' at the time of [the] incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Id.* (quoting *Hope*, 536 U.S. at 741).

The courts have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "*But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment*." *Tolan*, 134 S. Ct. at 1866 (emphasis added). "This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (citation omitted).

### 1. First Prong: Violation of a Federal Right

Claims of excessive force in the course of an investigation, arrest, or other "seizure" of a free citizen are analyzed under the Fourth Amendment's reasonableness standard. *Graham*, 490 U.S. at 395. "The inquiry into whether this right was violated requires a balancing of the nature and quality of the intrusion upon the person's Fourth Amendment interests against the

7

importance of the governmental interests alleged to justify the intrusion. *Tolan*, 134 S. Ct. at 1865 (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) and *Graham*, 490 U.S. at 396). Evaluation of an excessive force claim requires a court to consider whether the "totality of the circumstances" justified a particular use of force. *See Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985); *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004).

The reasonableness of a particular use of force is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and the inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 396-97. Thus, an officer's evil intentions will not make an objectively reasonable use of force unconstitutional, and good intentions will not make an objectively unreasonable use of force constitutional. *Id.* at 397. Determining whether force was reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Taken in the light most favorable to Mr. King, the evidence would establish that Deputy Hill's actions in shooting King were not "objectively reasonable" under the circumstances. As to the first of the *Graham* factors, any possible crime that was being investigated was not particularly serious, as Deputy Hill testified that he had been advised by Sherral Dalton that Mr. King had not harmed her, and Hill's testimony indicates that he did not think that there would be a basis for arrest at the time the deputies drove up to the Iroquois Avenue house. The *Graham* factor of whether there was active resistance to arrest or an attempt to evade arrest is not

8

particularly helpful here, as there is no evidence that the deputies were initially there to arrest King; they were entering the property to investigate and to talk to him, according to Hill, although King was hand-cuffed immediately after he was shot.

The key *Graham* factor at issue here is whether King posed an immediate threat to the safety of the deputies or others. There is conflicting evidence in this case that bears directly on that issue. For example, the following issues of fact, among others, are in dispute: (1) whether one or both of King's hands were, or were not, visible at the time of the shooting; (2) whether a jacket or coat was draped over one arm or was covering both arms entirely; (3) whether Hill could have reasonably perceived that King was holding a long gun (as Hill testified was his belief); (4) whether King was beginning to raise his hands in compliance with Deputy Walker's demands to do so; and (5) whether, at the time Hill fired the second shot (which most witnesses believed was the one to hit King), King was hunkering down to avoid getting shot, such that any perceived threat may have terminated before the firing of all shots after the first.

In assessing the degree of threat facing an officer, the courts may consider several non-exclusive factors, including: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

Application of the *Larsen* "degree of threat" factors also identifies disputes of fact preventing summary judgment. As to the first factor, there is some evidence that Deputy Walker was directing Mr. King to put down whatever was in his hands, but there are differing versions of what exactly was said to King. Witnesses also testified that, immediately before the shooting,

9

Walker was asking King to come out and talk, and it can be inferred from one witness's testimony that Walker asked Hill why he shot King immediately following the shooting. While King did not "comply" with the alleged command to put down whatever may have been in his hands, he could not have put down a weapon when he did not have one, and some witness testimony indicated that it was clear that King did not have anything in his hands.

The evidence is also in dispute as to the second factor - whether King made any hostile motions towards the officers with a weapon. The deputies contend that they believed (albeit mistakenly) that King may have had a weapon and was moving it under a jacket in a threatening manner, while yelling threats at the officers. The third factor (distance between the deputies and King) is not necessarily determinative. However, crediting the witness testimony that it was clear King had no weapon in his hands, as this Court must do at the summary judgment stage, the deputies' distances of between 20 and 75 yards away would certainly impact the reasonableness of any perceived threat from an unarmed man.

The fourth factor (manifest intentions of King) also presents issues of fact. As noted, witnesses provided different versions of what King said to the deputies. Verbal threats from an unarmed person (whom the deputies were informed was mentally ill), from 20 or more yards away, is not enough, standing alone, for this Court to determine as a matter of law that reasonable officers would have perceived an immediate threat of physical harm justifying the use of deadly force, because there would be no reason to believe that King could immediately carry out any threat from that distance.

The evidence and reasonable inferences, when viewed in favor of King, would establish that: King had not committed any serious crime or harmed any person at the time the deputies entered his property; the officers were informed that King was mentally ill and that there were no

known weapons in the house; King was unarmed at the time of shooting; both of his hands were visible; he could not have been holding a long gun; and any threats King made about black powder in the house did not pose any immediate threat to the deputies, who were 20-30 yards and 65-75 yards away from King, who was standing on the step near the front door of the house when he was shot. There is also no evidence that King appeared to pose any threat to any bystanders. In addition to King's wife, who was watching safely from a neighboring property, other witnesses were watching the events unfold from nearby, apparently not perceiving any imminent threat from King. According to one of those witnesses (neighbor Jones), Deputy Hill directed Jones, twice, to go inside his home so he would not see the shooting, and it is reasonable to infer therefrom that Jones himself did not feel that he was in danger. Deputy Hill's own statements regarding the threat he allegedly perceived were at least somewhat conflicting, as he indicated at the Review Board hearing that he did not think King even saw Hill and that he shot King, not because he feared for himself, but because he did not want anything to happen to the other two deputies. In contrast, in his deposition testimony and summary judgment papers, Hill alleged that he also shot King because he perceived a threat to himself.

Witness Sayres testified that he heard one of the deputies (the description of whom matches Deputy Walker's actions in yelling commands to King) ask immediately following the shooting, "What'd you do that for? What'd you do that for?" One could infer from that testimony that Deputy Walker was asking Hill why he shot King, which would also bear on the overall issue of whether an officer on the scene would have reasonably believed that King posed a threat of serious physical harm to Hill or the other deputies.

The Court is not determining that Deputy Hill's actions were unreasonable or determining that the facts establish a constitutional violation which is compensable. Rather, the

11

facts are genuinely disputed on critical issues and must be determined by a jury, which will weigh the conflicting evidence. These factual disputes are material to the issue of the reasonableness of Hill's actions, and Hill is thus not entitled to judgment as a matter of law based upon qualified immunity, so long as the law was clearly established under the second prong.

### 2. Second Prong: Cleary Established Law

In analyzing the second prong, whether the federal right was clearly established at the time of the violation, "'the salient question . . . is whether the state of the law' at the time of [the] incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Hope*, 536 U.S. at 741). In *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007), the court discussed the second prong in the context of claims of excessive force:

> "Ordinarily," we say that for a rule to be clearly established "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." However, because excessive force jurisprudence requires an all-things-considered inquiry with "careful attention to the facts and circumstances of each particular case," there will almost never be a previously published opinion involving exactly the same circumstances. We cannot find qualified immunity wherever we have a new fact pattern. Indeed, the Supreme Court has warned that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). The *Hope* decision "'shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional.'"
>
> We have therefore adopted a sliding scale to determine when law is clearly established. "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." Thus, when an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require a second decision with greater specificity to clearly establish the law.

509 F.3d at 1284 (citations omitted).

Deputy Hill argues that "there is no clearly established law sufficient to have put Deputy Hill on notice that his conduct was unreasonable in the situation he confronted," and that he is accordingly entitled to qualified immunity under the second prong. (Doc. 77 at 31). However, there are disputes as to what was "the situation he confronted." (*Id.*). It is undisputed that Hill used deadly force while King was unarmed, no weapons were found on the property, and Hill was at a distance of between 65 and 75 yards from King, and the other deputies were at least 20 yards from King, at the time of the shooting. Other material issues are in dispute, and the conflicting evidence drawn in King's favor would show that one or both of King's hands were visible, that King could not have been holding a long gun as Deputy Hill believed, and King did not pose a threat of serious physical harm to Hill or anyone at the time of the shooting. As the Supreme Court recently reiterated in *Tolan*, under either prong, this Court may not resolve disputed facts in favor of Deputy Hill and discredit the evidence supporting Mr. King. 134 S. Ct. at 1866. To grant summary judgment on this second prong, this Court would have to resolve the evidence in favor of the deputies' testimony that they had reason to believe that King had a long gun, while discrediting the evidence of witnesses who allege that it was clear that Mr. King was *not* armed and was *not* posing a threat.

At the time Hill shot King, the law was clearly established that a law enforcement officer may not use deadly force to seize an unarmed person who is not posing any threat to the officer or others. *See Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead"); *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003) (where person poses no immediate threat to the officer or others, deadly force was not justified to apprehend fleeing suspect); *Walker v. City of Orem*, 451 F.3d 1139, 1159-60 (10th Cir. 2006) (deadly force is justified if a reasonable officer in the defendant's position would have had

probable cause to believe there was a threat of serious physical harm to the officer or others); *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008) ("We do not think it requires a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself").[3] Summary judgment on qualified immunity grounds is accordingly inappropriate.

### B. *Bosh* Claim under the Oklahoma Constitution

In Count VI of his Third Amended Complaint, King asserts an excessive force claim under Okla. Const. art. 2, § 30. In *Bosh v. Cherokee County Building Auth.*, 305 P.3d 994, 996 (Okla. 2013), the Oklahoma Supreme Court recognized a private cause of action for such a claim. However, Deputy Hill argues that there is no "private right of action under the Oklahoma Constitution for the use of excessive force on non-incarcerated individuals." (Doc. 77 at 32). The Court disagrees, for several reasons. *First*, the language of *Bosh* expressly applies to non-incarcerated individuals, as *Bosh* determined that "pre-incarcerated detainees and arrestees" may maintain excessive force claims under the Oklahoma Constitution. *Bosh*, 305 P.3d at 1001. By definition, pre-incarcerated persons are *not* yet incarcerated.

*Second*, the language of the Oklahoma Constitutional provision that is the source of the private right of action found in *Bosh* provides Oklahoma citizens the protection to be "secure . . . against unreasonable searches and seizures." Okla. Const. art. 2, § 30. This language does not

---

[3] The parties here agree that Hill used "deadly force," even though Mr. King survived the shooting. This is consistent with the definition of "deadly force," which is "force that the actor uses with the purpose of causing or that he knows to create a substantial risk of causing death or serious bodily harm. Purposely firing a firearm in the direction of another person . . . constitutes deadly force." *Jiron*, 392 F.3d at 415, n.2.

provide lesser protections to citizens who are not jailed or incarcerated, but protects all citizens from unreasonable seizures.

*Third*, Bosh's reasoning is likewise not limited to incarcerated individuals. In arriving at the conclusion that art. 2, § 30 of the Oklahoma Constitution provides a private right of action for excessive force, the court reasoned as follows:

> In *Washington* [*v. Barry*, 55 P.3d 1036 (Okla. 2002)], we declared that, notwithstanding the provision of the OGTCA, a private action for excessive force exists pursuant to the Okla. Const. art. 2, § 9 for incarcerated persons. Having done so, *and having explained that those not yet convicted are assured of even greater rights*, it would defy reason to hold that pre-incarcerated detainees and arrestees are not provided at least the same protections of their rights, the same cause of action for excessive force under the Okla. Const. art. 2, § 30.

305 P.3d at 1001 (emphasis added). The court made its pronouncement in *Bosh* retroactive to the date that the Oklahoma Court of Civil Appeals determined *Bryson v. Oklahoma County*, 261 P.3d 627 (Okla. Civ. App. 2011), because the *Bosh* pronouncement did "not establish a new principle of law," but was "foreshadowed by" *Washington*, as was recognized by the Oklahoma Court of Civil Appeals in *Bryson*. *Bosh*, 305 P.3d at 1002, n.34.

The portions of *Washington* and *Bryson* referenced in *Bosh*, in turn, relied directly upon *Graham v. Connor*, 490 U.S. 386, 394 (1989). *See Washington*, 55 P.3d at 1039; *Bryson*, 261 P.3d 627, 638-39. *Graham* involved a plaintiff who claimed that police used excessive force in the course of an investigatory stop. 490 U.S. at 386. The Court framed the issue as follows: "This case requires us to decide what constitutional standard governs a *free citizen's* claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person. We hold that such claims are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Id.* at 388 (emphasis added). The plaintiff in *Graham* had an excessive force claim for a violation of the Fourth Amendment, even

though he had not been convicted, nor had he been even arrested or taken to jail. The Oklahoma courts' reliance upon *Graham* dispels Deputy Hill's contention that the Oklahoma Constitution does not provide a private right of action for excessive force used against "non-incarcerated individuals."

*Fourth*, other Oklahoma federal courts have *not* limited claims under Okla. Const. art. 2, § 30 to claims of excessive force applied against incarcerated persons. In *Leonard v. City of Tulsa*, No. 13-CV-256-CVE-FHM, 2013 WL 3216078 (N.D. Okla. June 24, 2013), the court denied a motion to dismiss a claim under art. 2, § 30. There, the plaintiffs alleged that officers entered plaintiffs' home without a warrant or probable cause, handcuffed one plaintiff and threw him to the floor, ransacked the home, and verbally assaulted plaintiffs. The plaintiffs were not incarcerated, and were not even arrested; the officers left their home after determining that one of the plaintiffs was not the suspect they were seeking. *Id.* The court broadly described the right of action announced in *Bosh*: "In *Bosh*, the Oklahoma Supreme Court found that a plaintiff had a claim against a municipality based on the acts of an employee that violated plaintiff's state constitutional rights, specifically Okla. Const. art. 2, § 30." *Leonard*, 2013 WL 3216078, at *3.

In *Ibarra v. City of Tahlequah*, No. 12-CV-98-JHP, 2013 WL 1991546 (E.D. Okla. May 13, 2013), the court determined that the plaintiff alleged facts sufficient to state a *Bosh* claim. The plaintiff in *Ibarra* alleged that, while attending a cookout, he was informed that his girlfriend was being hit outside, so he exited the residence and witnessed police officers assaulting his girlfriend. After he asked one officer about the events unfolding, an officer struck plaintiff in the head, causing him to fall to the ground, he was then restrained, and officers continued to hit him. He also claimed that an officer illegally searched and seized money from plaintiff's car. All of the events forming the basis for the art. 2, § 30 claim occurred prior to or in

the course of arrest, before plaintiff was either detained in jail or convicted and incarcerated. In finding that the plaintiff may maintain a *Bosh* claim, the court broadly described the right of action recognized in *Bosh*: "Article 2, § 30 . . . mirrors the Fourth Amendment of the United States Constitution. Accordingly, a plaintiff may seek relief under the private right of action created by *Bosh* for violations of Article 2, § 30." *Ibarra*, 2013 WL 1991546, at *3.

In *White v. City of Tulsa*, 979 F. Supp. 2d 1246 (N.D. Okla. 2013), the court granted a plaintiff's motion to amend his complaint to add claims under Okla. Const. art. 2, § 30 for unlawful search and seizure. Although his claims did not involve excessive force, the court found it "unlikely that the Oklahoma Supreme Court would carve out one type of Article 2, § 30 violation and exclude other types of violations" as the foundation for a private right of action under that provision of the Oklahoma Constitution. In addition to citing the expansive language of art. 2, § 30, which prohibits (among other things) "unreasonable searches and seizures," the court observed that a footnote in *Bosh* indicates that the Oklahoma Supreme Court "was aligning itself with those states creating a constitutional tort for violation of citizens' rights to be secure against unreasonable searches and seizures, rather than creating a more limited claim for only those cases involving excessive force." 979 F. Supp. 2d at 1249-50 (noting *Bosh*'s citation and analysis of *Binette v. Sabo*, 710 A.2d 688 (Conn. 1998)).[4]

In his reply brief, counsel for Deputy Hill attached a Minute Sheet from another case in which the court dismissed a *Bosh* claim based on the arguments made by Hill here. (Doc. 93;

---

[4] Here, the Court need not determine whether Oklahoma citizens have a private right of action under the Oklahoma Constitution for all violations of their rights to be free from unreasonable searches and seizures, because this case involves only a claim for excessive force by a law enforcement officer. Nevertheless, the court's reasoning in *White* is persuasive and supports the analysis in this Opinion and Order.

Doc. 93-3; *see* Doc. 77 at 26, in *Cook v. Peters*, No. 13-CV-107-GKF-FHM). One day after the hearing and related Minute Sheet in that case, the court reconsidered its initial ruling and stated:

> On sua sponte reconsideration of its oral rulings during yesterday's hearing on motions for summary judgment, the court hereby reverses itself with regard to its rulings on the Bosh claim (Claim VI), as plaintiff's counsel has persuaded the court that the private right of action for excessive force recognized by the Oklahoma Supreme Court must apply to all arrestees and pre-incarcerated detainees who are seized. To do otherwise would afford greater rights (including no tort limit caps and respondeat superior liability) to . . . prisoners than to those who are not prisoners, and would run contrary to the text of the Supreme Court's language in Bosh. The motions for summary judgment are therefore denied as to plaintiff's Bosh claim.

(Apr. 23, 2014 Minute Order, Doc. 134 in *Cook v. Peters*, No. 13-CV-107-GKF-FHM). This Court agrees with the reasoned analysis in the *Cook v. Peters* Minute Order, which rejected the same argument made by Deputy Hill here.

Mr. King has properly asserted an excessive force claim under art. 2, § 30 of the Oklahoma Constitution, precluding summary judgment on that claim.

**IV.    Conclusion**

For the foregoing reasons, defendant Lamont Hill's Motion for Summary Judgment (Doc. 77) is **denied.**

DATED this 20th day of June, 2014.

_____
JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE

18