**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| DONALD FRANCIS KING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 12-CV-137-JED-TLW |
| v. ) | |
| ) | |
| STANLEY GLANZ, in his Official ) | |
| Capacity as Sheriff of Tulsa County; and ) | |
| LAMONT HILL, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

**I.  Background**

Plaintiff, Donald Francis King, sustained severe injuries as a result of a gunshot fired by Deputy Lamont Hill, who is employed by the Tulsa County Sheriff's Office (TCSO). Mr. King has asserted three claims against Sheriff Glanz, in his official capacity, under 42 U.S.C. § 1983, alleging that the TCSO maintained a "custom and usage" of excessive force (Count II), negligently trained Hill (Count III), and negligently supervised Hill (Count IV). King also asserts claims against Glanz under the Oklahoma Governmental Tort Claims Act (OGTCA) (Count V) and the Oklahoma Constitution, article 2, § 30 (Count VII). Sheriff Glanz has moved for summary judgment (Doc. 79) on all claims.

A summary of the evidence relating to the shooting of Mr. King is set forth in the Court's Opinion and Order denying Deputy Hill's motion for summary judgment, and that summary is incorporated herein. (*See* Doc. 96). The Court will discuss any additional material facts where appropriate to address Sheriff Glanz's specific arguments below. In addition, the well-established standards governing summary judgment determinations are recited in that Opinion and Order (*id.*) and are incorporated, rather than repeated, herein.

## II.     Analysis

### A.     Claims under 42 U.S.C. § 1983

Mr. King has sued Sheriff Glanz in his official capacity. Such official capacity suits are considered to be claims for municipal liability; here, the claims against Glanz in his official capacity are claims against the County. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (an official capacity "suit is, in all respects other than name, to be treated as a suit against the entity"); *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998) (an official capacity claim is the same as a suit against the municipal entity). A municipality may not be held liable under § 1983 solely because its employee inflicted injury; municipal liability cannot be found by application of the theory of *respondeat superior*. *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, ___ U.S. ___, 131 S. Ct. 1350, 1359 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). Thus, to establish municipal liability under § 1983, a plaintiff must show "(1) the existence of a municipal policy or custom and (2) a direct causal link between the policy or custom and the injury alleged." *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)). The requirement of a policy or custom distinguishes the "acts of the municipality from acts of employees of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479.

#### 1.     Count II – Custom of Excessive Force

In Count II of his Third Amended Complaint, King alleges that the County had a "custom and usage of excessive force" and thereby "acquiesced" in Hill's excessive force. (Doc. 44 at ¶¶

32-34).  To survive summary judgment on Count II, King must provide evidence of a practice that is "so permanent and well settled as to constitute a custom or usage with the force of law," that amounted to deliberate indifference to the rights of persons with whom deputies come in contact, and was the moving force behind the violation of plaintiff's constitutional rights.  *See Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (quoting *Adickes v. S.H. Kress & Co.*, 396 U.S. 144, 168 (1970)); *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403-04 (1997); *Canton*, 489 U.S. at 389.  "In order to establish a custom, the actions must be 'persistent and widespread.'" *Lankford*, 73 F.3d at 286 (quoting *Starrett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989); *Monell*, 436 U.S. at 691).

King has not provided any evidence or argument supporting his allegations of a "custom" of excessive force.  (*See* Doc. 86).  He has not identified any persistent, widespread, permanent or well-settled practice of excessive force, as is required to establish a custom supporting municipal liability under § 1983.  The only incident cited is Deputy Hill's shooting of Mr. King.  That does not establish a custom.  Consistent with the plain meaning of "custom," proof of an isolated incident does not show a custom.  *See Lankford*, 73 F.3d at 286; *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993).[1]

It is also undisputed that the TCSO had a formal policy describing appropriate uses of force, and that Deputy Hill was trained in the use of deadly force every year since he became a

---

[1] In response to summary judgment, Mr. King alleges a "custom and policy that allowed deputies to unlawfully entered [sic] upon King's private property when they had no reason to believe a crime was committed." (Doc. 86 at 17).  That allegation suffers from several problems. King did not bring any claim for illegal entry upon his property; all of his claims are directly related to excessive force arising out of the shooting. (*See* Doc. 44 at 4-7 [alleging claims relating to excessive force]). In any event, King has not provided any evidence of such a widespread, persistent or well settled practice of permitting unlawful entry upon land, or that constituted deliberate indifference to King's rights, or that was the moving force behind the shooting of King.

deputy in 2001. (*See* Doc. 79 at 8, ¶ 3, which plaintiff admitted). The formal policy contained a provision regarding the use of deadly force, which is the type of force used in this case. It is undisputed that the terms of the deadly force policy are consistent with the requirements and constraints of the United States Constitution, and its terms are almost identical to the terms of a deadly force provision in a model use of force policy published by the International Association of Chiefs of Police. (*See* Doc. 86-9 at 9 [King's expert report]). King has not provided any evidence of any widespread practice of using deadly force that was inconsistent with TCSO's formal policy.

As plaintiff has not provided any evidence to support his separate allegation of a custom of excessive force, Sheriff Glanz's Motion for Summary Judgment on Count II is granted.

    2.    *Count IV – Negligent Supervision*

In Count IV, King asserts a claim for negligent supervision of Deputy Hill. (Doc. 44 at ¶¶ 40-41). The Tenth Circuit treats allegations of failure to supervise the same as failure-to-train claims. *Whitewater v. Goss*, 192 Fed. Appx. 794, 797 (10th Cir. 2006) (citing *Medina v. City & County of Denver*, 960 F.2d 1493, 1500 (10th Cir. 1992); *Schepp v. Fremont County, Wyo.*, 900 F.2d 1448, 1454 (10th Cir. 1990); and *Meade v. Grubbs*, 841 F.2d 1512, 1527-28 (10th Cir. 1988)). To withstand summary judgment on his inadequate supervision claim, King must provide evidence of a failure to supervise, which amounts to deliberate indifference to the federal rights of persons with whom the TCSO deputies come into contact, and that there is a direct causal link between the constitutional deprivation and the inadequate supervision. *See Whitewater*, 192 Fed. Appx. at 797; *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003) (similar elements on failure to train) *Canton*, 489 U.S. at 389.

Mr. King's summary judgment response does not provide any evidence or argument in support of his claim for inadequate supervision under Count IV; instead, he focuses only on his allegations of negligent training under Count III. (*See* Doc. 86 at 12 [alleging municipal constitutional deprivations "because of the inadequate training of Lamont Hill"]; *id.* at 16 [alleging a link between the constitutional deprivation and "the failure to train Hill properly" and that "the deputies [had not] been trained in the proper way"]).

Because King has not provided evidence supporting his separate negligent supervision claim, Glanz's Motion for Summary Judgment is *granted* on Count IV.

### 3. Count III – Negligent Training

The focus of Mr. King's summary judgment response regarding § 1983 is on his claim for negligent training under Count III of his Third Amended Complaint. (Doc. 44 at ¶¶ 36-38; Doc. 86 at 12-16). With respect to failure to train claims, the Supreme Court has recognized "limited circumstances in which an allegation of a 'failure to train' can be the basis for [§ 1983 municipal] liability." *Canton*, 489 U.S. at 387. Inadequate training of officers "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. The Supreme Court has recently reiterated that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 131 S. Ct. at 1359.

In accordance with Supreme Court precedent, the Tenth Circuit has identified specific requirements for a plaintiff to prevail on a § 1983 claim against a municipality for failure to train its law enforcement officers in the use of force:

> [A] plaintiff must first prove the training was in fact inadequate, and then satisfy the following requirements: (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the

5

> inadequate training demonstrates a deliberate indifference on the part of the [municipality] toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000) (quoting *Allen v. Muskogee, Okla.*, 119 F.3d 837, 841-42 (10th Cir. 1997)); *see also Carr*, 337 F.3d at 1228.

Here, Mr. King's evidence satisfies the first two elements enumerated above, as the Court has determined there to be genuine disputes of material fact regarding the constitutionality of Deputy Hill's use of deadly force against King (*see* Doc. 96), and it does not appear that the parties contest that deputies can reasonably be expected to confront agitated, mentally ill persons on domestic disturbance calls on a recurring basis. Thus, the key issues here are the elements of deliberate indifference and causation, which the Court will address in turn below.

### *Deliberate Indifference*

A municipality may be liable where "the need for more or different training is so obvious, and the inadequacy [in training] so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. The "touchstones of this inquiry, therefore, are the risk inadequate training poses and the [municipality's] awareness of that risk." *Brown*, 227 F.3d at 1288-89. In *Connick*, the Supreme Court further elaborated on the deliberate indifference required to impose municipal liability under § 1983 for a failure to train:

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution."

> A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities. . . ."
>
> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference'- necessary to trigger municipal liability." Without notice in a particular respect, decision-makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

131 S. Ct. at 1359-60 (internal citations and quotations omitted). The Supreme Court also noted that it had not foreclosed "the possibility that the unconstitutional consequences of failing to train could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations," but reiterated that such liability is only available in a "rare" case involving a "narrow range of circumstances." *Id.* at 1361 (quoting *Bryan County*, 520 U.S. at 409); *see also id.* at 1366 (Scalia, J., concurring) (characterizing such claims as "rare").

Mr. King has not presented any evidence of a pattern of similar constitutional violations (excessive force) by untrained deputies of the TCSO; he argues, instead, that this case falls within that narrow range of circumstances where unconstitutional consequences of failing to train are so patently obvious that the County may be held liable without proof of any pre-existing pattern of violations. King very generally describes the alleged inadequacies in the training of TCSO deputies. King first complains that the TCSO "does not have a policy that differentiates between individuals with mental illness and those without when it comes to making contact and initiating an arrest." (Doc. 86 at 16). He also faults TCSO's training as follows: "Hill should have been trained in a manner to properly evaluate King's actions to determine that King posed no threat to the officers or bystanders. Further, training should have included methodology in how to deescalate a person like King who was experiencing extreme agitation." (*Id.*).

7

Although King contends that the TCSO has no policy regarding contact and arrest of individuals with mental illness, it is undisputed that, at the time of the shooting, the TCSO had a policy titled "Arrest/Detention of Persons with Unstable Mental Status," which provides in part: "If the person does not pose an immediate threat to themselves or others, is not placed under arrest, but suffers from some sort of unstable mental status, the deputy may consider contacting COPES.  COPES will respond to the scene, when requested, usually within 30 minutes or will assist with a telephone consultation, if needed."  (*See* TCSO Policy 11-13, Doc. 79-7 at 5). King's expert, Dr. Lyman, opines that the deputies apparently did not consider the option of contacting COPES, "but had [COPES] been contacted, it is likely that the situation involving King would have been peacefully resolved without the use of deadly force."  (Doc. 86-9 at 14).

Dr. Lyman further opines that, when deputies drew their weapons and aimed at King, they "escalated the situation and served only to heighten the levels of aggravation and tension," and he suggests that such actions show that the deputies were inadequately trained.  (*Id.* at 16-17).  However, the TCSO use of force policy identifies when deputies may display their firearms, and plaintiff has not presented any evidence that the policy or training thereon is deficient in such an obvious manner as to constitute deliberate indifference by the County:

> [Deputies] may display firearms when:
>
> a.  The deputy has a reasonable belief that immediate danger of serious physical harm may exist;
>
> b.  The deputy has a reasonable suspicion that an offender may be armed with a deadly weapon; [or]
>
> c.  A deputy is otherwise authorized to use deadly force.

(Doc. 79-6 at 5).

The use of force policy further provides that deputies are authorized to use deadly force only when one or both of the following requirements exist:

> a. To protect themselves or others when the deputy has reason to believe that there is immediate danger of death or serious bodily harm and use of deadly force is reasonable to protect themselves or others;
>
> b. To prevent the escape of a fleeing felon when the deputy has probable cause to believe both:
>
>> b.1 The subject has committed a felony involving the infliction or threatened affliction of serious physical injury or death; and
>>
>> b.2 The subject's escape would pose an imminent danger of death or serious physical harm to deputies or others.

(*Id.*). Dr. Lyman quotes the deadly force policy and acknowledges that its terms are consistent with what he calls "nationally recognized standards" as established by case law and the International Association of Chiefs of Police guidelines. (*See* Doc. 86-9 at 9). As noted above, Mr. King does not dispute that the TCSO policy on deadly force comports with the Constitution.

Moreover, King has not explained how the County had notice that the absence of additional policies or training were likely to result in constitutional violations. This failure to provide evidence is especially glaring in light of the existence of TCSO policies which, according to King's own expert, would have prevented the shooting of Mr. King had deputies followed the instruction provided by the policies.

Dr. Lyman also suggests that deputies should have retreated to safety rather than continue to confront Mr. King. That method of de-escalation *is* the subject of a TCSO policy, which specifically authorizes deputies to safely retreat from situations in which their own lives are in danger. (*See* Doc. 79-6 at 7). While Deputy Hill's actions and inactions relating to alleged escalation may be relevant to King's claims against Hill in that they may bear on whether Hill acted reasonably in using force against King, there is no evidence that the County's training was

so obviously insufficient as to provide the County with notice that a lack of additional training was likely to cause a constitutional violation. Without such evidence, the failure to train claim fails because there is nothing in the record to support the deliberate indifference element.

King cites *Allen*, 119 F.3d 837, as an example of a similar case in which deliberate indifference was found. This case differs from *Allen*. In *Allen*, there was evidence of particular improper training and, specifically, that the municipality "trained its officers to leave cover and approach armed suicidal, emotionally disturbed persons and to try to disarm them, a practice contrary to proper police procedures and tactical principles." 119 F.3d at 843. The court thus found that "the record contains evidence that the officers were trained to act recklessly in a manner that created a high risk of death," which was "sufficient to support an inference that the need for different training was so obvious and the inadequacy so likely to result in violation of constitutional rights that the policymakers of the City could reasonably be said to have been deliberately indifferent to the need." *Id.* at 844.

In contrast to the evidence in *Allen*, the undisputed evidence here establishes that the TCSO's policies properly advised deputies regarding the constitutional constraints on the use of deadly force, provided instructions as to the limited circumstances under which firearms should be drawn, and instructed deputies on the potential for enlisting COPES when dealing with persons who were mentally unstable. While *Allen* identified specific training which plaintiff's expert testified was "out of synch with the entire United States in terms of what police are being trained to do," *id.* at 843, that is not so here. King and his expert rely on the *absence* of training that allegedly could have assisted them during their encounter with King. Moreover, unlike the expert in *Allen*, plaintiff's expert has opined that, had the deputies either contacted COPES (as authorized by the TCSO policy) or acted properly under the TCSO deadly force policy, it is

10

likely that Mr. King would *not* have been shot. For these reasons, the Court finds that *Allen* is distinguishable on its specific evidentiary record.

The facts of this case are more analogous to those presented in *Carr*, 337 F.3d 1221. In *Carr*, the decedent was fatally shot by police. The personal representative of the decedent's estate brought suit for excessive force under § 1983 against the police officers involved in the shooting and against the City that employed them. The claims against the officers survived summary judgment, but the municipal liability claim against the City did not. With respect to the City, the plaintiff and his experts alleged at least 15 inadequacies in the City's training of officers, including the following, which are similar to allegations here: inadequate training in procedures for conducting investigatory detentions and control of subjects who might threaten officers with objects; "failure to train officers properly in recognition and proper handling of emotionally disturbed persons"; and "inadequate training to recognize that an emotionally disturbed person should have been approached cautiously and in a non-confrontational manner." *See* 337 F.3d at 1225-26. The district court granted summary judgment to the City on the plaintiff's inadequate training claim. *Id.* at 1224.

In affirming summary judgment for the City on the inadequate training claim, the Tenth Circuit in *Carr* concluded that the plaintiff had not provided evidence supporting the deliberate indifference component of the municipal liability claim. *Id.* at 1229-32. The court noted that the plaintiff had not provided any evidence of "how the City had notice that its actions (or failures to act) were likely to result in constitutional violations" and had not "illustrated how the City consciously chose to disregard the risk of harm." *Id.* at 1229.

The court in *Carr* rejected claims of specific inadequacies in training that are very similar to the alleged failures in training in this case. For example, Mr. King faults the TCSO for failing

11

to provide proper training in the areas of evaluation and approach of mentally ill persons and de-escalation of situations involving such persons. King further alleges that the deputies' actions in advancing as a group toward King's front door, drawing firearms, and aiming their firearms at King "escalated the situation" and that "[a]n officer properly trained in dealing with the mentally ill would know this and would have taken steps to calm the situation." (Doc. 86-9). The court in *Carr* rejected very similar allegations by the expert there, that "prudent well-trained officers would have realized that Mr. Carr was an emotionally disturbed person, and thus should be approached in as cautious and non-confrontational manner as possible. Instead [officers] closed the distance between themselves and Mr. Carr, with weapons drawn and shouting commands at him." *Carr*, 337 F.3d at 1230. Rejecting that contention, the court in *Carr* stated:

> But the fact that someone with the opportunity to prepare an expert report at leisure opines that well-trained officers would have performed differently under pressure does not rise to the legal standard of deliberate indifference on the part of the City, for Carr fails to point to any evidence placing the City on actual or constructive notice that the asserted failures to train were substantially certain to result in a constitutional violation.

*Id.* The same is true in this case, as Mr. King has not presented evidence showing, in any way, that the County had notice, either by a pattern of violations or by patently obvious deficiencies in training, such that it could be found by a reasonable jury to have been deliberately indifferent to the rights of persons who would come into contact with TCSO deputies.

In summary, there is no evidence that the County had notice of any pattern of excessive force by deputies who had not been trained in the allegedly lacking evaluation and de-escalation methods. There is also no evidence that it was so "patently obvious" that the alleged failure to provide such training would result in excessive force. Accordingly, King has not provided any evidence from which a reasonable jury could find that the County was deliberately indifferent to King's constitutional rights by any failure in training. In the absence of such evidence, to permit

municipal liability would improperly "result in *de facto respondeat superior* liability on municipalities." *See Connick*, 131 S. Ct. at 1359-60. Summary judgment is accordingly proper on King's failure to train claim. *See Carr*, 337 F.3d at 1229-31; *see also Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 773 (10th Cir. 2013) (affirming summary judgment on failure to train claim, as plaintiff "failed to show, as the law requires, that 'the need for more or different training [was] so obvious' that a violation of her constitutional right . . . was likely to result from not providing it").

*Direct Causal Link*

Even assuming that King had provided evidence that could support a finding of deliberate indifference by the County, his claim would still fail because he has provided no evidence of the necessary causal link between any deficiency in training and the force used against King. With respect to the causation element, "in order for liability to attach in a failure to train case, 'the identified deficiency in [the municipality's] training program must be closely related to the ultimate injury,' so that it 'actually caused' the constitutional violation." *Brown*, 227 F.3d at 1290 (quoting *Canton*, 489 U.S. at 391).

While King has alleged some general failures of training regarding handling of mentally ill persons, he has not identified any inadequate training that could be said to have led directly to the use of excessive force against King. He has also failed to provide any evidence of how the training or lack thereof actually resulted in the shooting. Further, as noted above, TCSO's policy regarding detention or arrest of mentally ill persons authorized deputies to contact COPES for assistance, and Dr. Lyman opines that, had the deputies made such contact, King would likely *not* have been shot. King's excessive force claim depends upon allegations that Hill excessively used deadly force in the absence of any reason to believe that King posed any immediate danger

13

of death or serious bodily injury to any other person. Plaintiff does not dispute that TCSO's policy on deadly force would specifically *prohibit* deadly force against an unarmed person who was not posing any threat to anyone. Hence, the alleged failure to provide any additional training was not "so closely related" to the shooting that it "actually caused" it, because (according to Dr. Lyman) the shooting would likely *not* have happened if Hill had contacted COPES as permitted under TCSO policy 11-13 or complied with the deadly force policy set forth in TCSO policy 10-07.

Instead of supplying evidence that any training inadequacy caused the shooting, King and his expert ask the Court to assume that the "operational approach" used by the deputies in approaching King "is evidence that the deputies were not properly trained." (*See* Doc. 86-9 at 13). The Court is unwilling to assume inadequate training based only on the deputies' actions and then make a further leap in logic to determine that the alleged inadequacies in training were the direct cause of those actions. As the court in *Carr* concluded, such an exercise "partake[s] of the post hoc, ergo propter hoc fallacy rather than providing any evidence of how the training (or lack thereof) actually resulted in the excessive force" used against King. *See* 337 F.3d at 1231.

Even if some inadequacy in training had been shown and Mr. King had provided evidence of deliberate indifference by County policymakers, King's failure to train claim still fails because he has not supplied any evidence of direct causation. Sheriff Glanz's Motion for Summary Judgment is accordingly granted on Count III of the Third Amended Complaint.

**B.     OGTCA Claim**

Sheriff Glanz argues for summary judgment on Mr. King's claim under the OGTCA, based on the argument that "Deputy Hill's actions were appropriate under the circumstances when faced with a serious, imminent threat of harm to himself and other officers, from a non-

compliant individual, who was making verbal threats of bodily harm and even death towards Defendant Hill as well as his fellow officers." (Doc. 79 at 17). The Court has already found the existence of genuine disputes of material fact regarding Deputy Hill's use of deadly force, which preclude summary judgment on King's claims against Hill. (Doc. 96). Because Glanz's sole argument for summary judgment on the OGTCA claim is based on a determination that Hill acted appropriately, Sheriff Glanz's Motion for Summary Judgment is likewise denied.

### C. Claim under the Oklahoma Constitution

Sheriff Glanz seeks summary judgment on King's claim under art. 2, § 30 of the Oklahoma Constitution on two grounds. First, Glanz asserts that, because Deputy Hill acted appropriately under the circumstances, there can be no *respondeat superior* liability for Hill's conduct. As noted above with respect to the OGTCA claim, the same genuine disputes of material fact regarding the constitutionality of Deputy Hill's conduct prevent summary judgment on King's *respondeat superior* claim under the Oklahoma Constitution. Second, Glanz argues that non-incarcerated individuals have no private right of action under Okla. Const. art. 2, § 30. The Court has likewise disposed of that argument in addressing Deputy Hill's identical summary judgment argument. (*See* Doc. 96 at 14-18). For the same reasons set forth in the Opinion and Order denying Deputy Hill's summary judgment motion, the Court denies Glanz's motion for summary judgment on King's Oklahoma Constitution claim for *respondeat superior* liability.[2]

---

[2]    In *Bosh v. Cherokee County. Bldg. Auth.*, 305 P.3d 994, 1002-03 (Okla. 2013), the Oklahoma Supreme Court noted that "[a]ssaults of excessive force can certainly occur within one's scope of employment," and held that the doctrine of *respondeat superior* applies to actions for excessive force brought under the Okla. Const. art. 2, § 30. In arriving at that conclusion, the *Bosh* court reasoned that "there is no reason why the doctrine of *respondeat superior* should not apply to hold employers liable for their employees['] violation of a plaintiff's rights under art. 2, § 30 where the employees act within the scope of their employment. The problems of federalism which preclude the application of *respondeat superior* to § 1983 actions are obviously not present when the action is for a violation of a state's constitution." *Id.* at 1004.

### III.     Conclusion

Sheriff Glanz's Motion for Summary Judgment (Doc. 79) is **granted in part** and **denied in part**. Specifically, summary judgment is granted in favor of Sheriff Glanz on Mr. King's municipal liability claims under § 1983 (Counts II, III, and IV), and is denied as to King's claims under the OGTCA (Count V) and Okla. Const. art. 2, § 30 (Count VII).

DATED this 23rd day of June, 2014.

_____
JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE